| | | |
|---|---|---|
| ANTHONY MASHNI, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 10951 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Anthony Mashni brings this lawsuit against his employer, the Board of Education of the City of Chicago, for discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA," for short) and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and for intentional infliction of emotional distress.[1] R. 1, Compl.[2] Mashni claims that the principal and assistant principal at the Norman A. Bridge School (which is a Chicago public school) mocked, insulted, and harassed him because of his generalized anxiety disorder. *Id.* Mashni also claims that the Board failed to accommodate his disability and retaliated against him for requesting the accommodation. *Id.* The Board seeks summary judgment on all of Mashni's claims. R. 41, Mot. Summ. J. For the reasons discussed below, the motion is granted in part and denied in part.

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

[2]Citations to the docket are indicated by "R." followed by the docket number and, where appropriate, a page or paragraph number.

# I. Background

In deciding the Board's motion for summary judgment, the Court views the evidence in the light most favorable to Mashni, because he is the non-movant. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Before summarizing the facts of this case, the Court first addresses two arguments raised by the Board: (1) that Mashni's statement of additional facts violates Local Rule 56.1, and (2) that several statements in Mashni's declaration should not be considered. *See* R. 59, Def.'s Reply Br. at 2-3.

## A. Local Rule 56.1

The Board argues that a number of statements in Mashni's Local Rule 56.1 Statement of Additional Facts, R. 49, should be disregarded. Def.'s Reply Br. at 2. The Board generally alleges that PSOF[3] ¶¶ 6-16, 18, 19, 25, 26, 31, 33, 34, 41, 46, and 49 are "opinion/argumentative, conclusory, vague, immaterial, speculative, and/or hearsay" are therefore improperly asserted—but fails to elucidate each individual statement's shortcomings. *Id.* This scattershot approach does not warrant striking those statements in their entirety.

First of all, the Board has not cited "*specific* references to the affidavits, parts of the record, and other supporting materials relied upon …" in its responses to PSOF ¶¶ 6-11, 14, and 33, as required by Local Rule 56.1. *See* L.R. 56.1(a), (b)(3)(B)

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Board's Statement of Facts [R. 42], "PSOF" for Mashni's Statement of Additional Facts [R. 49], "Pl.'s Resp. DSOF" for Mashni's response to the Board's Statement of Facts [R. 48], and "Def.'s Resp. PSOF" for the Board's response to Mashni's Statement of Additional Facts [R. 60]. Where a fact is undisputed, only the asserting party's statement of facts is cited; where an assertion is made by one party and is otherwise challenged, it is so noted.

(emphasis added). So far from precluding Mashni's reliance on those statements, it is the Board that actually has conceded them as admitted. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[A] district court is entitled to expect strict compliance with Rule 56.1.")

In its responses to the remaining statements, the Board at least refers to the record. But even with those references, the Board neglects to explain exactly *what* about the statements is improper. PSOF ¶¶ 12-13, 15-16, 18, 19, 25, 26, 31, 34, 41, 46, and 49 state facts and cite to supporting material in compliance with Local Rule 56.1(b)(3)(C). Without any insight into the Board's *specific* reasons for asking to exclude the statements, the Court finds no reason to strike them out entirely. But because the Board's responses to those statements comply with Local Rule 56.1, properly disputed statements will be treated as such.

Two of these statements require additional comment. The Court will not strike PSOF ¶¶ 6 and 46, but Mashni must reduce their substance to admissible form before trial. *See Payne v. Pauley*, 337 F.3d 767, 775 n.3 (7th Cir. 2003) ("Evidence presented to defeat a summary judgment motion need not be in admissible form, but it must be admissible in content."). PSOF ¶ 6 relies on hearsay statements from Mashni's psychiatrist, Theodore Handrup. Because the statements were made for the purpose of supporting Mashni's request for a reasonable accommodation of his alleged disability, they are not records of a regularly conducted activity. *See* Fed. R. Evid. 803(6). So Dr. Handrup must testify to the substance of PSOF ¶ 6 if it is to be allowed at trial. PSOF ¶ 46 relies partly on

documents that were produced in discovery and discussed in Mashni's declaration, but were not included in the record. *See* R. 50-1, Mashni Dec. ¶ 3 (discussing third parties' applications to the Marine Leadership Academy position). At trial, Mashni must offer the actual documents, and then they may be allowed for a nonhearsay purpose or under Federal Rule of Evidence 803(6) (with the proper foundation laid).

Additionally, although Mashni did not raise this issue in a sur-reply (at some point the back and forth must cease), the Court will strike the first sentence of DSOF ¶ 29 on its own initiative, because that statement is not supported by the record. DSOF ¶ 29 states that Christopher Brake closed Mashni's position at the Bridge School on April 18, 2015, citing Brake's declaration. DSOF ¶ 29; R. 42-6, Brake Dec. ¶ 12.[4] But Brake testified in his deposition that he did not remember when he closed the position. Pl.'s Resp. DSOF ¶ 29; R. 50-6, Brake Dep. at 35:16-20. The Board "may not raise a disputed material fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in a prior deposition." *See Adusumilli v. City of Chi.*, 164 F.3d 353, 360 (7th Cir. 1998). Without an explanation as where the April 18 date came from, the Board cannot assert that Brake closed Mashni's position on that date.

---

[4]The record contains two Brake declarations, at R. 42-6 and R. 60-5. This Opinion will identify the cited declaration by the appropriate docket number. The same will apply to depositions that were filed in multiple versions, with each version containing different excerpts from the deposition transcript. *See* Mashni Dep. [R. 42-7, R. 50-2, R. 60-6], Brake Dep. [R. 42-5, R. 50-6, R. 60-3], Cutler Dep. [R. 50-5, R. 60-8].

## B. Mashni Declaration

Next, the Board argues that paragraphs 2-7, 9, 11, 16, 18, and 19 of the Mashni Declaration should be stricken, adopting the same kitchen-sink arguments it deployed against the PSOF statements discussed above. For the same reasons discussed in the previous section, the Court leaves those paragraphs in place.

But the Court will strike paragraphs 12-14 of the Declaration. In these paragraphs, Mashni attempts to supplement his deposition testimony with additional instances of alleged harassment—even though he repeatedly attested to the completeness of his answers during the deposition itself. *See, e.g.,* R. 50-2, Mashni Dep. at 355:21-356:8 ("Q: Have we talked about all the facts that support your claims that you raised in the lawsuit? … A: I believe we covered most of the facts. Q: Are there additional facts that support your claims that we have not discussed? A: I don't believe so.") This inconsistency between affidavit and deposition testimony is not permitted, at least without a reasonable explanation. "Where a deposition and affidavit are in conflict, the affidavit is to be disregarded and the court should only consider the deposition unless it is demonstrated that the statement in the deposition was mistaken." *Kaplan v. City of Chi.*, 2004 WL 2496462, at *2 (N.D. Ill. Nov. 4, 2004) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001)) (quotations omitted). Mashni attempts to explain his earlier omission by arguing that his anxiety medication, Klonopin, "caused [him] to feel foggy[,] making it difficult to retriev[e] information." Mashni Dec. ¶ 12. But Mashni does not offer any evidence that Klonopin has that side effect, or any details about what would aggravate or mitigate the memory problems (such as dosage, time

passage since taking the medication, whether time of day affects the purported problem, and so on). At that level of generality, the Board cannot begin to test Mashni's conclusory assertion about how memory problems would impair the recall of the facts concerning Brake's alleged harassment. And even if the medication had that effect, there was nothing preventing his attorney from trying to refresh Mashni's memory on redirect examination over the course of his three-day-long deposition. At least if Mashni's attorney had done that, then the defense could have asked Mashni questions during the deposition (or, at worst, sought to re-open the deposition during the fact discovery period). What's more, there is no suggestion in the record that Mashni attempted to correct his deposition answers after reviewing the transcript, under Federal Rule of Civil Procedure 30(e)(1). If he had done *that*, the Board again would have had a chance to follow-up on the newly averred facts. The omitted facts are *central* to Mashni's hostile work environment claim, so his failure to disclose them earlier is not reasonable. So the paragraphs will be disregarded, as will any PSOF statements that rely on them. With these issues now addressed, the Court turns to a description of the facts.

### C. Factual Background

Mashni is an employee of the Board of Education of the City of Chicago, which operates the Chicago public-school system. DSOF ¶¶ 1-2. He has worked for the Board as a Technology Coordinator since 2008. Pl.'s Resp. DSOF ¶ 7. In 2011, he began working in that role at Norman A. Bridge School, where the pertinent events took place. DSOF ¶¶ 7-8; Pl.'s Resp. DSOF ¶ 7. The Bridge School consists of

two campuses (a junior high school and an elementary school) and serves students from pre-kindergarten through the eighth grade. DSOF ¶ 9. Its principal, Christopher Brake, manages the School's operations and supervises the Board employees staffed at the School. *Id.* ¶¶ 10-11.

In August 2011, Brake hired Mashni to oversee the School's technological equipment and assist staff with technology-related issues. DSOF ¶ 11. Mashni's responsibilities extended to both campuses—he had an office at both the elementary school and the junior high and worked at both locations on a daily basis. *Id.* ¶ 15.

At first, Mashni worked well under Brake, receiving good reviews for his performance. PSOF ¶ 1; 11. But their relationship started to sour in the summer of 2014, when Mashni began experiencing the symptoms of what was later diagnosed as generalized anxiety disorder. *Id.* ¶¶ 11-12. Although Mashni believes that he has suffered from anxiety for his entire life, the condition did not become "debilitating" (in his words) until June 2014, *id.* ¶ 9, and was not formally diagnosed until November of that year, R. 50-1, Mashni Dec. at Exh. 1, FMLA Health Cert. Mashni estimates that he suffered episodic flare-ups of anxiety about three times a week— and sometimes as often as every day—from June to November 2014, and about thirty times total between mid-November 2014 and mid-January 2015. PSOF ¶ 7. During these flare-ups, Mashni feels like he is in "flight and fear mode"—his thoughts race, his body shakes, he cries and he vomits. *Id.* Mashni treats his anxiety with a combination of prescription medication and regular sessions with a psychologist and psychiatrist. *Id.* ¶ 10.

Mashni asserts that he told Brake about his anxiety disorder in August or September 2014. PSOF ¶ 13. During this conversation, Mashni described his disorder and its attendant symptoms in detail. *Id.* From this moment onward, Mashni claims, Brake's attitude towards him became "extremely hostile." *Id.* Brake would ignore Mashni, swear at him, and belittle him in front of other Bridge School staff—calling him an "asshole" and "incompetent idiot" to other staff members and telling other employees that he "really need[ed] to hire a new technology coordinator," all while Mashni was in earshot. *Id.* ¶¶ 14-15, 18. Brake, for his part, denies that he was ever told about Mashni's anxiety, much less that he responded with such hostility. Def.'s Resp. PSOF ¶ 13; R. 60-5, Brake Dec. ¶ 7.

Over the next couple of months, Mashni alleges (and the Board disputes) that Brake regularly subjected Mashni to harassment and verbal abuse, questioning his competency and mental capabilities and often driving him to tears. PSOF ¶¶ 16-24. After technical problems interfered with a staff presentation, Brake blamed Mashni and cursed at him, "You fucking should ha[ve] check[ed] that everything was working[,] you dumb idiot. I now have the fucking whole staff waiting and I look like the idiot, you asshole." *Id.* ¶ 16. In another incident, Brake attempted to dissuade a teacher from working with Mashni by telling her to "leave [Mashni] alone because he cannot multi-task for shit." *Id.* ¶ 17. Brake then warned Mashni to "focus on one thing[,] asshole[,] before I gut you like a pig." *Id.* ¶ 17.

Brake was not the only one who allegedly harassed Mashni because of his anxiety disorder. Mashni contends that Assistant Principal Juan Cardona caused

him discomfort by prying into his personal life—asking Mashni what medications he was taking, telling him to see a psychiatrist and therapist, and advising him to deal with his stress by "go[ing] crazy on your wife." PSOF ¶ 19.

Partly because of this harassment, Mashni's anxiety grew progressively worse. Between June 2014 and January 2015, Mashni suffered three panic attacks at work. PSOF ¶ 9. Mashni characterizes these panic attacks as inducing "seizure-like symptoms": he cannot walk, talk, or control his breathing, and when the attacks are at their severest, he may involuntarily soil himself. *Id.* ¶ 8. Mashni claims that Brake and Cardona witnessed these panic attacks (they deny it). *Id.* ¶ 12; Def.'s Resp. PSOF ¶12.

In October 2014, Mashni's anxiety caused him to start missing work, culminating in a week of full disability leave in early November. PSOF ¶¶ 20, 23. When Mashni told Brake that he needed to go on leave, Brake stated—according to Mashni—"[W]e always knew you were a little mental, but I wanted to keep you around because you are like the [three-legged] family dog." *Id.* ¶ 21. Meanwhile, Cardona responded to Mashni's request for leave by telling him, "[Y]ou're going to have to see a psychiatrist, and you should tell the psychiatrist you're hearing voices but you don't understand what the voices are telling you to do." *Id.* ¶ 22.

With Mashni out of the office, Brake hired an hourly employee to help cover Mashni's responsibilities. DSOF ¶ 18. Despite this, Mashni received work-related questions nearly every day of his November leave. PSOF ¶ 23. A month later, in

December 2014—after Mashni had come back to work—Brake hired a second hourly technology employee. DSOF ¶ 18.

Upon his return, Mashni confronted Brake. PSOF ¶ 24. He told Brake that Brake's and Cardona's harassment was triggering panic attacks. *Id.* ¶ 24. When the school clerk interrupted the meeting, Brake remarked to her, "[C]an you believe this guy is trying to blame his mental problems on me[?]" *Id.* ¶ 24. Mashni burst into tears and ran out. *Id.* ¶ 24. Brake does not remember this encounter. Def.'s Resp. PSOF ¶ 24; R. 60-3, Brake Dep. at 88:9-11.

Mashni claims that, in another incident, Brake walked in on Mashni while Mashni was having a panic attack in the bathroom. PSOF ¶ 25. According to Mashni, Brake watched him throw up and told him, "This is bullshit. You just need to die already." *Id.* ¶ 25. Brake does not remember ever seeing Mashni throw up at the School and flatly denies ever telling him to "just die already." Def.'s Resp. PSOF ¶ 25; R. 60-3, Brake Dep. at 90:12-19.

Mashni alleges a litany of other instances where Brake and Cardona mocked his condition. PSOF ¶¶ 26-32. He claims that Cardona called him a "pussy" for crying at work, asked him if someone should call an ambulance in case Mashni passed out, and joked that other Bridge School staff should light candles to calm Mashni. *Id.* ¶ 26-29. Brake allegedly ridiculed Mashni by pretending to cry and taunting, "Oh, my life is terrible. I want to kill myself. I can't go on anymore." *Id.* ¶ 26. Whenever Brake or Cardona heard an ambulance go by, they would mock Mashni by asking him, "[W]e hear an ambulance, are you okay?" *Id.* ¶ 27. Brake

also insulted Mashni in front of other Bridge School employees, telling a teacher working with Mashni, "[D]on't even bother with him, he will just end up crying, he's useless." *Id.* ¶ 28. Brake and Cardona categorically deny making any of these remarks. Def.'s Resp. PSOF ¶¶ 26-32; R. 60-4, Cardona Dec.; R. 60-5, Brake Dec.

On January 13, 2015, Mashni suffered a panic attack at work. DSOF ¶ 19. An ambulance was needed to transport him from the School to the hospital. PSOF ¶ 32. Mashni did not return to work the next day; instead, he went on an indefinite[5] leave of absence. DSOF ¶ 19. He was told that, pursuant to the terms of the Chicago Teachers' Union collective bargaining agreement,[6] the Board would hold his position for him for twelve weeks. *Id.* ¶ 23. If he did not return to work by the end of those twelve weeks—March 27, 2015, his so-called "Job Protection Date"—then the Board would not guarantee that he would have a job to return to. *Id.* ¶¶ 23-24.

On March 11, Mashni reached out to Brake. PSOF ¶ 34. Over text message, Mashni requested to speak with Brake before he returned to work, "preferably in person." *Id.* ¶ 34. Brake replied that he was busy; he later followed up and suggested a meeting date. Def.'s Resp. PSOF ¶ 34. When Mashni then asked that

---

[5]Mashni argues that the leave was not "indefinite" because his psychiatrist estimated that he would be able to return to work by April 6, 2015. Pl.'s Resp. DSOF ¶ 19; R. 50-1, FMLA Health Cert. But that estimate was made on February 24, FMLA Health Cert., more than a month into Mashni's leave, and the return-to-work date was not communicated to the Board until March 27, 2015, R. 50-1, Mashni Dec. at Exh. 1, Ltr. to EOCO. So on January 14, Mashni started his disability leave with no known return-to-work date.

[6]Mashni claims that he is not a member of the Chicago Teachers' Union, so the terms of their collective bargaining agreement "may" not apply to him. Pl.'s Resp. DSOF ¶ 23; Mashni Dec. ¶ 2. But whether or not the collective bargaining agreement controls is immaterial to this lawsuit because Mashni does not allege that his status as a non-union member entitles him to *more* than twelve weeks of job protection.

they meet "offsite … not at the school," Brake cut him off: "Forget it," he retorted, "See you when you return. Stop bothering me already." PSOF ¶ 34; Def.'s Resp. PSOF ¶ 34. Also on March 11, Brake instructed his staff to deactivate Mashni's door access to the Bridge School and delete Mashni's computer passwords. PSOF ¶ 35.

In late March, Mashni submitted a letter to the Board's Equal Opportunity Compliance Office ("EOCO," for short) Administrator through his attorney. DSOF ¶ 25. The letter described the hostile work environment at the Bridge School and requested reasonable accommodation for Mashni's anxiety disorder, pursuant to the Americans with Disabilities Act. R. 50-1, Mashni Dec. at Exh. 1, Ltr. to EOCO. Mashni asked "[t]o be placed as a Technology Coordinator II at a different school, preferably on the Northwest side of Chicago." R. 50-1, Mashni Dec. at Exh. 1, Reas. Accomm. Form. In support of the request, Mashni's psychiatrist, Dr. Handrup, submitted two forms describing Mashni's condition, which he diagnosed as "generalized anxiety disorder w/ panic attacks & OCD features." *See* FMLA Health Cert.; R. 50-1, Mashni Dec. at Exh. 2, CPS Health Cert. Dr. Handrup gave the condition's commencement date as November 3, 2014, and stated that he had been seeing Mashni on a weekly basis since then. FMLA Health Cert. Mashni's symptoms were listed as "severe panic attacks, depression, [and] <u>suicidal thoughts</u>," and inability "to perform any function that may require focus, concentration, or task application <u>until further notice</u>." *Id.* (emphasis in original). As for Mashni's future prognosis, Dr. Handrup opined that "[patient]'s illness will be ongoing indefinitely,

however removing or [reducing] stressors will improve [patient]'s condition (i.e.[,] hostile work environment)." CPS Health Cert.

EOCO assigned Alan Cutler to investigate Mashni's accommodation request. DSOF ¶ 31. Cutler met with Mashni and his attorney on April 27, 2015. *Id.* ¶ 32. They discussed a number of accommodation options, including allowing Mashni to remain in his current position but work only[7] at the Bridge School's junior high school campus, and postponing Mashni's Job Protection Date until his accommodation request was resolved. *Id.* Mashni and Cutler also determined that the Board had no vacant technology positions at that time. *Id.* In response to the harassment allegations, Cutler advised Mashni that he could file a formal EOCO complaint against Brake and Cardona, but Mashni did not do so. PSOF ¶ 40. The next day, April 28, Cutler interviewed Brake and learned that Brake had already closed Mashni's position at the Bridge School. DSOF ¶ 35.

About a week after the Cutler meeting, Mashni identified an open job posting for a STEM Technology Specialist and informed EOCO that he would accept

---

[7]In the PSOF, Mashni claims that he asked only to "mov[e] his … office to the Junior High building to reduce his daily contact with Brake and Cardona." PSOF ¶ 39; *see also* Mashni Dec. ¶ 8 ("I ... offered … [to] mov[e] my *work location* to the Bridge Junior High … ." (emphasis added)); Pl.'s Resp. Br. at 17 (asserting that Mashni suggested "working *primarily* at the Junior High Building" (emphasis added)). But in his deposition, Mashni went further than that: he asked to work *only* in the junior high school. R. 42-7, Mashni Dep. at 327:18-328:5 ("Q: … [I]s it fair to state that you were looking for a position outside of or away from Bridge at another school? A: Yes and no. Part of my accommodation was to not be removed from the whole entity of Bridge because most of the harassment was, you know, happening with what—at a certain time, certain place. So I asked if there was availability to *just* work at the junior high, you know, accommodate me that way and I could *only* work at the junior high." (emphasis added)); 328:14-18 ("A: So if [the junior high] would have been my designated work location and my *only* designated work location, I felt that would greatly help with my anxiety and take away the harassment." (emphasis added)). Where an affidavit and deposition conflict, the Court will consider only the deposition testimony. *Kaplan*, 2004 WL 2496462, at *2 (quoting *Amadio*, 238 F.3d at 926).

reassignment to that role. DSOF ¶ 36. But EOCO denied that request. *Id.* ¶ 37; R. 42-4, Cutler Dec. at Exh. 11, EOCO Resp. Ltr. In a letter dated May 19, EOCO stated that it was "unable to provide a directed reassignment to another school" because, pursuant to the Chicago Teacher's Union collective bargaining agreement, "[s]eniority will be considered in the selection of computer technicians and technology coordinators I, II and III seeking transfer to an announced vacancy."[8] EOCO Resp. Ltr. The letter did not, however, claim that there were other candidates for the STEM position more senior to Mashni. *Id.*

The letter went on to inform Mashni that his position at the Bridge School had been closed on April 18, 2015 "due to budgetary concerns and the changing needs of the instructional program." EOCO Resp. Ltr. To compensate, EOCO retroactively extended Mashni Job Protection Date by three weeks, from March 27 to April 18, 2015. *Id.* Finally, EOCO advised Mashni of his right to appeal its decision and explained the appeal process. *Id.* No appeal was submitted, and EOCO closed Mashni's file. DSOF ¶ 40; PSOF ¶ 47.

Mashni continued to apply for vacant positions on his own, and was hired in August 2015 as a Technology Coordinator at Marine Leadership Academy, another Chicago public school, where he continues to work until this day. DSOF ¶ 41; Pl.'s Resp. DSOF ¶ 41; PSOF ¶ 50. The parties disagree as to Mashni's employment status between his Job Protection Date and his hiring at the Marine Leadership Academy. *Id.* The Board contends that Mashni remained employed through the

---

[8]In its summary judgment briefs, the Board does not assert that seniority is the reason it denied Mashni the STEM position. R. 43, Def.'s Br.; Def.'s Reply Br. at 18.

summer. DSOF ¶ 41. According to the Board, Mashni was released from medical leave on August 20, 2015, and immediately staffed in his new position at Marine Leadership Academy. *Id.*; R. 42-11, DSOF at Exh. 9, Frank Dec. ¶¶ 14, 16. Mashni disputes this, arguing that, because he did not return to work before the end of the 2014-15 school year, the Board's policies called for him to receive a termination letter on June 30. PSOF ¶ 48. Mashni stops short, however, of asserting that he *actually* received a termination letter. *Id.*

Although he was hired at Marine Leadership Academy, Mashni filed suit against the Board for disability discrimination under the ADA and the Rehabilitation Act, and for intentional infliction of emotional distress. The Board now moves for summary judgment against all of Mashni's claims.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a

form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Mashni raises four claims in the Complaint: discrimination in violation of the ADA, 42 U.S.C. § 12112 (Count 1); retaliation in violation of the ADA, § 12203 (Count 2); discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794 (Count 3); and a state-law claim for intentional infliction of emotional distress (Count 4). The Board moves for summary judgment on all four claims. Mot. Summ. J. Because Mashni concedes that summary judgment is appropriate against the retaliation claim, R. 47, Pl.'s Resp. Br. at 1, that leaves Counts 1, 3, and 4.

### A. "Disability" Under the ADA

The ADA protects "qualified individual[s]" from employment discrimination "on the basis of disability." 42 U.S.C. § 12112(a). As a threshold matter, then, it is necessary to determine whether Mashni has shown (to a reasonable factfinder's satisfaction) that he is "disabled" within the meaning of the ADA.[9] *See Kotwica v. Rose Packing Co.*, 637 F.3d 744, 748 (7th Cir. 2011) (plaintiff "bears the burden of

---

[9]The Rehabilitation Act borrows the ADA's definition of disability. *See Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008).

showing that [he] falls within the scope of the ADA's anti-discrimination provisions" (citation omitted)). An individual can be disabled in three ways: (1) by having a "physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A) & (2); (2) by having "a record of such an impairment," § 12102(1)(B); or (3) by "being regarded as having such an impairment," § 12102(1)(C) & (3). Mashni argues that he is disabled under all three definitions.

But first, a note on the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended in various sections of Title 42).[10] Congress enacted these amendments to correct the "inappropriately high level of limitation" on ADA claims created by Supreme Court precedent and, in doing so, stressed that "the primary object of attention in cases brought under the ADA should be whether [employers] have complied with their obligations," not whether an employee is disabled. *Horgan v. Simmons*, 704 F. Supp. 2d 814, 818 (N.D. Ill. 2010) (citing § 2(b)(5), 122 Stat. at 3554). So "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* That said, "though the [2008 amendments] make[] it *easier* to prove a disability, it does not *absolve* a party from proving one." *Neely v. PSEG Tex., Ltd.*, 735 F.3d 242, 245 (5th Cir. 2013) (emphasis in original). And, of course, the statutory definition is, above all else, what Mashni must satisfy.

---

[10]Because the facts giving rise to this case occurred in 2014 and 2015, Mashni's claims are governed by the post-amendment ADA.

Mashni argues that he is disabled under the ADA because his anxiety disorder represents a "mental impairment" that "substantially limits [the] major life activities" of speaking, breathing, concentrating, thinking, and communicating. *See* PSOF ¶¶ 6-10; 42 U.S.C. § 12102(2)(A) (definition "major life activities"). According to his own testimony, his disorder manifests through bouts of racing thoughts, uncontrolled breathing, uncontrollable crying and shaking, and sometimes vomiting, multiple times a week. PSOF ¶ 7. Less frequently, Mashni experiences full-blown panic attacks that render him completely incapacitated and at times cause him to soil himself. *Id.* ¶ 8. In order to manage his anxiety disorder, Mashni takes two prescription medications and sees a therapist regularly. *Id.* ¶ 10. These symptoms are corroborated by two health certificates completed by Mashni's psychiatrist, Dr. Handrup, who formally diagnosed Mashni as having "generalized anxiety disorder w/ panic attacks & OCD features." *See* FMLA Health Cert.; CPS Health Cert. Moreover, Mashni's disorder prompted him to take two disability leaves in as many months. PSOF ¶¶ 23, 33. Indeed, the condition's seriousness can be inferred from the intensity of Mashni's treatment: during his second disability leave, he received roughly three sessions of out-patient treatment per week, on top of weekly medication-management appointments and biweekly individual psychotherapy. FMLA Health Cert.

The Board, meanwhile, has produced no record evidence that contravenes this portrayal of Mashni's anxiety disorder. *See Williams v. AT & T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 824-25 (W.D. Tenn. 2016) (holding that plaintiff had an

"actual impairment" as a matter of law, where she testified that her depression and anxiety affected her cognitive skills and corroborated that testimony with medical records, and where defendant failed to refute plaintiff's testimony). Mashni has provided more than enough evidence to allow a reasonable jury to find that his anxiety disorder substantially limited his speaking, breathing, concentrating, thinking, or communicating.[11] *See Dentice v. Farmers Ins. Exch.*, 2012 WL 2504046, at *11 (E.D. Wis. June 28, 2012) (plaintiff had presented a triable issue of material fact with respect to whether he was disabled where he provided evidence that he received medical treatment for his generalized anxiety disorder, panic disorder, and depression, and took a nine-month leave of absence from work to deal with his symptoms); *Monroe v. Cnty. of Orange*, 2016 WL 5394745, at *7 (S.D.N.Y. Sept. 27,

---

[11]Because Mashni is "disabled" based on the anxiety disorder's effects on his breathing, thinking, and other bodily functions, the Court need not consider whether his symptoms constitute a significant impairment on the major life activity of working. That is a more complicated analysis, because the plaintiff must carefully thread a needle. On the one hand, he must show that his disability limited his ability to work a broad range of jobs, not just one particular job or under one particular supervisor. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1060 (7th Cir. 2000) (plaintiff's impairments must "substantially limit employment generally"); *Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*, 461 F.3d 932, 936 (7th Cir. 2006) (same); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525-26 (7th Cir. 1996) (inability to work with specific supervisor is not a substantial impairment on ability to work); *see also Chi. Reg'l Council of Carpenters v. Thorne Assocs., Inc.*, 893 F. Supp. 2d 952, 962 (N.D. Ill. 2012) ("The few cases analyzing this issue after the enactment of the [ADA Amendments Act of 2008] reflect that the 'broad range of jobs' requirement survives the [amendments to the ADA]." (citations omitted)). On the other hand, he must still be a "qualified individual," such that he can perform all the essential functions of his job. 42 U.S.C. §12111(8).

The Court need not undertake this analysis in full, but does make one note: the fact that Mashni is able to work at Marine Leadership Academy does not, by itself, disqualify him from claiming disability based on a substantial impairment of his ability to work. "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as medication [or] learned behavioral or adaptive neurological modifications." 42 U.S.C. § 12102(4)(E)(i)(I) & (IV). Mashni currently manages his condition with the aid of two prescription medications and regular psychiatric care, PSOF ¶ 10—he could very well be unable to perform his job if it were not for these mitigation measures.

2016) (no reasonable jury would conclude that plaintiff's breathing was not substantially limited by his agoraphobia and "history of anxiety and panic," the symptoms of which included panic attacks).

The Board argues that, if Mashni's disorder renders him "incapacitated" as he claims, he is not a "qualified individual" and so has pled himself out of court. Def.'s Reply Br. at 6-7. The ADA protects only those who are "qualified," meaning they "can perform the essential functions" of their jobs "with or without reasonable accommodation." 42 U.S.C. § 12111(8). And if Mashni cannot function at all with his disability, the Board reasons, he certainly cannot perform the tasks required of a Technology Coordinator. Def.'s Reply Br. at 7.

But Mashni does not allege that he is incapacitated *all* the time. His most severe symptoms emerge only when he is suffering from "flare-ups" or panic attacks—or when he is subjected to harassment by coworkers. PSOF ¶¶ 8-9. An episodic impairment qualifies as a disability so long as it "substantially limit[s] a major life activity *when active*." *Horgan*, 704 F. Supp. 2d at 818 (emphasis added) (citing 42 U.S.C. § 12102(4)(D)). When Mashni's anxiety disorder is "active," such as in the middle of a panic attack, he cannot control his breath, body, thoughts, or emotions. PSOF ¶ 7. But when his condition is *not* active, or when it is being managed through medication and therapy, he is able to work as normal—as evidenced by the fact that he is doing fine at Marine Leadership Academy, DSOF ¶ 41.

Because Mashni has sufficiently established his disability as a mental impairment that substantially limits major life activities, there is no need to reach the issue of whether Mashni is disabled under the "record of disability" or "regarded as disabled" definitions.[12]

## B. ADA Claims

As an individual with a disability, Mashni may avail himself of the ADA's employment discrimination protections. He alleges that the Board discriminated against him in three ways: (1) by subjecting him to a hostile work environment on the basis of his disability; (2) by failing to accommodate his disability; and (3) by effectively terminating him because of his disability. The Court will address each of these theories in turn.

## 1. Hostile Work Environment

As a threshold question, it is necessary to address whether hostile work environment is cognizable under the ADA. The Seventh Circuit has yet to decide this issue, although it has assumed (in both published and unpublished decisions) the theory's availability where the facts did not present a viable claim. *See, e.g., Shott v. Rush Univ. Med. Ctr.*, 652 F. App'x 455, 458 (7th Cir.), *cert denied*, 137 S.

---

[12]Because there is no case law preventing Mashni from establishing disability under all three definitions, however, *see Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 497 (1999) (Stevens, J., dissenting), *superseded by statute,* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, *as recognized in Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338 (2015) ("The three parts of th[e] definition [of disability] do not identify mutually exclusive, discrete categories."), Mashni will have to decide if he intends to present multiple definitions of disability to the jury. As a practical matter, it might unnecessarily confuse and burden the jury to pursue all three definitions. In any event, if Mashni wishes to argue that he is disabled in more than one way, then he must propose appropriate jury instructions.

Ct. 592 (2016); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009); *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). In the absence of Seventh Circuit authority, "courts in this district have generally assumed that the claim does exist." *Suvada v. Gordon Flesch Co.*, 2013 WL 5166213, at *8 (N.D. Ill. Sept. 13, 2013) (citation omitted); *but see Sibert v. Des Plaines Sch. Dist. 62*, 2017 WL 3219268, at *2 (N.D. Ill. July 28, 2017) ("The Seventh Circuit has not recognized such a cause of action, and this court declines to recognize such a novel legal theory.")

In recent years, more and more circuits have explicitly recognized hostile work environment claims under the ADA. *See Fox v. Gen. Motors Corp.,* 247 F.3d 169, 176 (4th Cir. 2001); *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 234–35 (5th Cir. 2001); *Lanman v. Johnson Cnty., Kan.*, 393 F.3d 1151, 1155-56 (10th Cir. 2004); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719-20 (8th Cir. 2003). The circuits that have yet to affirmatively recognize the claim nonetheless assume that it is a viable theory of recovery when analyzing and ultimately rejecting hostile work environment claims that fail to survive summary judgment on other grounds. *See, e.g., McDonough v. Donahoe*, 673 F.3d 41, 46 (1st Cir. 2012); *Flieger v. E. Suffolk BOCES*, 2017 WL 2377853, at *3 (2d Cir. June 1, 2017) (summary order); *Walton v. Mental Health Ass'n. of Se. Penn.,* 168 F.3d 661, 667 (3d Cir.1999); *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998); *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003); *Cooper v. CLP Corp.*, 679 F. App'x 851, 852–53 n.6 (11th Cir. 2017) (not precedential); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201

(D.C. Cir. 2008). No circuit has held that these claims are *not* available under the ADA. And because the statutory text from which Title VII hostile work environment claims spring is the same as the ADA's, *Fox*, 247 F.3d at 175 (comparing § 2000e-2(a)(1) (Title VII): "terms, conditions, or privileges of employment" with § 12112(a) (ADA): "terms, conditions, and privileges of employment"), the Court agrees that the ADA permits recovery for hostile work environment based on disability discrimination.

When analyzing hostile work environment claims under the ADA, the Seventh Circuit has "assumed that the standards for proving such a claim would mirror those … established for claims of hostile work environment under Title VII." *Mannie*, 394 F.3d at 982 (citations omitted). This requires proof that (1) the plaintiff's "workplace was both subjectively and objectively hostile"; (2) plaintiff was harassed because of his disability; and (3) the harassment was "so severe or pervasive as to alter the conditions of employment [or] create an abusive working environment." *Id.* (citations omitted)

Mashni has presented enough evidence in support of each element to survive summary judgment. First, a jury could reasonably find that Mashni's work environment was both objectively and subjectively hostile. *See Mannie*, 394 F.3d at 982. Although the complained-of conduct must go beyond "simple teasing, offhand comments, and isolated incidents (unless extremely serious)," *Silk v. City of Chi.*, 194 F.3d 788, 807 (7th Cir. 1999), the "working environment [need not] be 'hellish' before a [hostile work environment] suit can succeed," *Jackson v. Cnty. of Racine*,

474 F.3d 493, 500 (7th Cir. 2007)). Mashni readily meets this standard (if his version of the facts is believed). The subjective element is satisfied because not only did Brake's and Cardona's conduct frequently leave Mashni in tears, it ultimately triggered a panic attack so serious that he was rushed to the hospital in an ambulance. DSOF ¶ 19; PSOF ¶ 32; *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) ("Title VII comes into play before the harassing conduct leads to a nervous breakdown.").

On whether the hostility was objectively serious enough, relevant considerations include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Mashni alleges that, over the course of about five months (between August 2014 and January 2015), Brake and Cardona harassed him more than two dozen times. PSOF ¶¶ 14-32. Many of the comments were directed at Mashni; all were made within his earshot. *See Algarin v. Loretto Hosp.*, 2012 WL 710177, at *11 (N.D. Ill. Mar. 5, 2012) (offensive comments more likely to be objectively hostile if "made in the presence of the plaintiff and directed at the plaintiff") (citing *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 567 (7th Cir. 2000)). Several comments specifically mocked his disability. *See, e.g.*, PSOF ¶¶ 21, 26, 27, 29. At other times, Brake and Cardona insulted or mocked Mashni to his coworkers in Mashni's presence, humiliating him in front of others. *See, e.g.,* PSOF ¶¶ 15-18, 24, 28-29, 32. In aggregate, this conduct could be deemed

objectively hostile.[13] Of course, Brake and Cardona deny making any of these comments. Def.'s Resp. PSOF ¶¶ 14-32. But a jury, not this Court, must decide who to believe.

Next, Mashni must show that the harassment "alter[ed] the conditions of [his] employment." *See Mannie*, 394 F.3d at 982. He may do this by "demonstrating either a tangible employment action, such as discharge or demotion, or a non-tangible action, such as discriminatory conduct so severe or pervasive as to create an abusive working environment." *Id.* (citing *Silk*, 194 F.3d at 804-05). Mashni alleges that Brake's and Cardona's harassment drove him to take an indefinite leave of absence. *See* DSOF ¶ 19. He was so unwilling to return to the Bridge School that he remained on leave past both his original Job Protection Date and the extension provided by EOCO—putting his job in jeopardy. *Id.* ¶¶ 23-24, 37; PSOF ¶ 48. Based on these facts, Mashni can establish that he suffered a change in his working conditions. *See Bell v. City of Chi.*, 2004 WL 3119014, at *11 (N.D. Ill. Dec. 20, 2004) (rejecting defendant's argument that plaintiff "cannot demonstrate that the conditions of her employment were altered," where plaintiff "was moved to another office and ultimately took a medical leave of absence because of [her harasser's] conduct").

---

[13]Mashni also argues that Brake and Cardona harassed him by sending him text messages with work-related questions while Mashni was on disability leave. But this does not constitute offensive, much less harassing, behavior. *See Sibert*, 2017 WL 3219268, at *2 (N.D. Ill. 2017) ("It is difficult to conceive how [plaintiff] could have been working in a hostile work environment when he was on leave and not at work."); *Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 405 (D. Puerto Rico 2015) ("Leaves of absence do not erect barriers against communication between employers and employees on leave." (collecting cases)).

Finally, the record includes enough facts that, if credited by a jury, prove a causal relationship between Brake's and Cardona's harassment and Mashni's anxiety disorder. "[W]hen a harasser uses such [disability]-specific and derogatory terms as to make it clear that he is motivated by a general hostility to the presence of [disabled persons] in the workplace," that creates an "inference of discrimination on the basis of [disability]." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 562 (7th Cir. 2016) (evaluating Title VII claim) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)) (internal quotation marks omitted). Many of the harassing comments that Mashni attributes to Brake and Cardona refer to his anxiety disorder or to the symptoms of that disorder (namely, depression, crying, and reduced cognitive function). *See, e.g.*, PSOF ¶¶ 17 ("[L]eave [Mashni] alone because he cannot multi-task for shit."), 21 ("[W]e always knew you were a little mental."), 26 ("Oh, my life is terrible. I want to kill myself. I can't go on anymore."), 27 ("[W]e hear an ambulance, are you okay?"). Based on this, and the fact that Mashni claims the harassment began only *after* he told Brake about his disability, *id.* ¶ 31, a jury could infer that more content-neutral insults were also motivated by antipathy towards Mashni's disability.

Although Mashni has enough evidence to show a hostile work environment, he still must establish *employer* liability for it. The standard for employer liability differs depending on whether the harasser is a supervisor or merely a coworker: "[a]n employer may be strictly liable for harassment by supervisors [subject to the possibility of an affirmative defense], but a negligence standard applies for

harassment by coworkers." *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012). The parties agree that Brake supervised Mashni, DSOF ¶ 13; Pl.'s Resp. DSOF ¶ 13, but dispute whether Cardona did also, PSOF ¶ 5; Def.'s Resp. PSOF ¶ 5. Mashni argues that Cardona qualifies as a supervisor because he "ha[d] authority to give [Mashni] instructions or directions" Mashni, R. 50-6, Brake Dep. at 39:17-22, and "would give [Mashni] instructions on [his] daily tasks," R. 50-2, Mashni Dep. at 181:9-17. PSOF ¶ 5. But "supervisor is a term of art that denotes more than an individual with a higher rank, a superior title, or some oversight duties." *Jajeh*, 678 F.3d at 568 (internal quotation marks and citation omitted). "Rather, a supervisor … will generally have the authority to hire, fire, promote, demote, discipline or transfer a plaintiff." *Id.* Mashni does not assert that Cardona had these powers and indeed the record reflects that he did not, *see* R. 50-6, Brake Dep. at 39:14-16 ("Q: Did Mr. Cardona have authority to discipline Mr. Mashni? A: No."). So, for the purposes of the hostile work environment claim, Cardona counts as a coworker. The Court will therefore assess the Board's liability for Cardona's conduct under the negligence standard, while liability for Brake's conduct is analyzed under the affirmative-defense framework set out in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

First, Cardona. An employer is liable for a coworker's harassment if it was "negligent in either discovering or remedying the harassment." *Jajeh*, 678 F.3d at 569. Here, there is no dispute as to whether the Board knew of Cardona's alleged harassment; Mashni complained of his behavior directly to EOCO. *See* PSOF ¶ 39;

Def.'s Resp. PSOF ¶ 39. "Once an employer is aware of workplace harassment, it can avoid liability by taking prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Jajeh*, 678 F.3d at 569 (citations and quotation marks omitted). "[P]rompt investigation is the hallmark of reasonable corrective action." *Vance v. Ball State Univ.*, 646 F.3d 461, 473 (7th Cir. 2011) (citation omitted). But the Board, by its own admission, made no attempt to investigate the harassment claims through EOCO. Def.'s Resp. PSOF ¶ 43. Nor did the Board attempt to separate Mashni and Cardona by, for example, transferring one of them to a different workplace, *see Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048-49 (7th Cir. 2000), or even temporarily separating them within the same workplace to undertake an investigation. A jury could reasonably interpret these omissions as a failure by the Board to fulfill its legal duty to rectify workplace harassment.

Next, Brake. Because he is a supervisor, the Board is strictly liable for Brake's alleged harassment unless it successfully asserts the *Ellerth* affirmative defense. *See Ellerth*, 524 U.S. at 765. The defense is available only if Brake did not institute a tangible employment action against Mashni. *See id.* In that case, the Board may avoid liability by establishing that (1) it exercised "reasonable care to prevent and correct promptly any harassing behavior"; and (2) Mashni "unreasonably failed to take advantage of any preventative or corrective opportunities provided by [the Board] or to avoid harm otherwise." *See id.*

Here, Mashni argues that Brake took a tangible employment action against Mashni when he closed Mashni's position at the Bridge School.[14] As a result, he reasons, the Board cannot assert the *Ellerth* defense at all. The Court disagrees. "A tangible employment decision requires an official act of the enterprise, a company act." *Ellerth*, 524 U.S. at 762. Often, the decision is "documented in official company records, and may be subject to review by higher level supervisors." *Id.* In most cases, the action "inflicts direct economic harm." *Id.*

The power to close Mashni's position certainly "fall[s] within the special province of the supervisor." *See Ellerth*, 524 U.S. at 762. But Mashni has not shown

___

[14]Mashni also argues that "Brake's ... actions were tantamount to a termination under [the Board's] policy." Pl.'s Resp. Br. at 14. The policy in question requires workers on disability leave to return by their Job Protection Date or be subject to termination. PSOF ¶ 48; R. 50-5, Cutler Dep. at 68:19-69:9. But even assuming that Mashni was actually terminated, that would not constitute a "tangible employment action" in this context. An employer is only cut off from the *Ellerth* defense if the tangible action was "taken *by the harassing supervisor*." *Johnson v. West*, 218 F.3d 725, 731 (7th Cir. 2000) (emphasis in original) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998)).

In *Johnson v. West*, the Seventh Circuit held an employer not liable for firing the plaintiff where the plaintiff's termination was partly caused by her *harasser* but did not result from his *harassment*. 218 F.3d at 731. In that case, the plaintiff filed a complaint with her employer's EEO office, alleging that her supervisor had sexually harassed her. *Id.* at 729. Her employer transferred her to another position so she would not have to work with her supervisor while the EEO office investigated her complaint. *Id.* While the investigation was still pending, however, the plaintiff encountered her (now former) supervisor in a hallway and hit him in the face. *Id.* at 729. The supervisor reported her to their employer and, even though the EEO investigation ultimately concluded that the plaintiff had been sexually harassed, the plaintiff was fired for the assault. *Id.* The Seventh Circuit held that, even though the supervisor's "actions created a hostile working environment for" the plaintiff and "his report of her actions resulted in her being fired," there was no causal link between the harassment and her firing. *Id.* at 731. The supervisor "played no role in the decision to fire [the plaintiff], and the decision to fire her was made .... [through] the proper administrative channels." *Id.*

If Mashni was indeed terminated after his Job Protection Date, that termination resulted from the application of the Board's general policies, not from Brake's harassment. In fact, Mashni admits as much. *See* PSOF ¶ 48 (stating not that Mashni *was* terminated, but that he "would receive a termination letter due to the loss of his job protection" "[u]nder the Board's policies").

that this caused "economic" harm to him, *id*.: nowhere does he allege that he experienced a change in status, pay, or benefits as a result. Brake closed Mashni's position sometime before April 28, 2015 (the Board claims that the specific date was April 18, 2015). DSOF ¶ 35; R. 42-4, DSOF at Exh. 3, Cutler Dec. ¶ 17; Cutler Dec. at Exh. 8, Case Record Log; EOCO Resp. Ltr. But Mashni's job protection had already expired on March 27, 2015 (it was retroactively extended by EOCO to April 18, EOCO Resp. Ltr.), yet he remained employed until at least June 30.[15] DSOF ¶ 24; PSOF ¶ 48; *see Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009) (no tangible employment action where plaintiff understood that she was on leave, remained on the employer's weekly schedule despite her absence, and was listed as "active" on employer's payroll system). So Mashni has not established that the act of closing his position caused him tangible economic harm. In fact, around the time Brake closed Mashni's position, Mashni had already asked EOCO to be transferred away from the Bridge School and was in the process of discussing that accommodation. DSOF ¶ 24, 32, 35-36; Reas. Accomm. Form; *see also Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 702-03 (7th Cir. 2001) (lateral transfer without loss of benefits was not an adverse employment action).

---

[15]Remember, Mashni and the Board dispute whether there was ever a break in his employment status. The Board contends that he remained on employed and on a leave of absence until his hiring at Marine Leadership Academy, DSOF ¶ 41; Mashni argues that, under Board policy, he should have received a termination letter, PSOF ¶ 48. But Mashni never contends that he was actually terminated. He states only that the Board's policies called for him to "receive a termination letter … on June 30" if he was not released to return to work by the end of the school year, PSOF ¶ 48, (and there is no indication that he was released). Because the Court must take all inferences in the light most favorable to Mashni, it is assumed that the Board's policies were followed and Mashni received this letter on June 30.

What's more, Mashni has not established a causal relationship between Brake's harassment and his decision to close Mashni's position. *See* Seventh Circuit Pattern Jury Instruction 3.05B; *Johnson v. West*, 218 F.3d 725, 731 (7th Cir. 2000); *cf. Ellerth*, 524 U.S. at 765 (employer may not raise an affirmative defense if plaintiff "can demonstrate that a supervisor's harassment *culminated* in a tangible employment action" (emphasis added)). The Board contends that Brake closed the position for a nondiscriminatory reason; namely, that he thought it would save money to eliminate the salaried Technology Coordinator position and replace it with two hourly employees. DSOF ¶ 30. Mashni offers nothing to discredit the genuineness of Brake's intention.[16] *See* Pl.'s Resp. DSOF ¶ 30. Therefore, the Board may raise an affirmative defense.

But even though the *Ellerth* defense is available, the Board has not produced enough undisputed evidence of the defense to prevail at summary judgment. The Board points to (1) its promulgation of a comprehensive nondiscrimination policy and (2) its establishment of an equal employment opportunity office tasked with investigating employee complaints, DSOF ¶¶ 5-6, as proof that it has "exercised reasonable care to prevent and correct promptly any … harassing behavior," *Ellerth*, 524 U.S. at 765. But "[t]he mere existence of such a policy … does not necessarily establish that the employer acted reasonably in remedying the harassment after it has occurred or in preventing future misconduct." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 953 (7th Cir. 2005). And the Board has not shown

---

[16]Mashni disputes that Brake's decision actually saved money. Pl.'s Resp. DSOF ¶ 30. But that is not the point; Mashni must rebut the sincerity of the motive, not whether, down the road, the school actually ended up saving money.

that it took any steps to *correct* Brake's harassing behavior; in fact, it admits that it did not even investigate the alleged harassment. Def.'s Resp. PSOF ¶ 43; *see also Cerros*, 398 F.3d at 954 ("[T]he absence of [an investigation] may signal a failure to meet this standard of 'prompt and appropriate corrective action.'").

The Board contends that Mashni, not the Board, bears responsibility for the absence of an investigation into Brake's conduct. When Mashni met with EOCO representatives in April 2015, he was given the option of filing a formal complaint against Brake and Cardona, but declined to do so. PSOF ¶ 40. The EOCO representatives did their part, the Board argues, but Mashni "unreasonably failed to take advantage of [the] preventative or corrective opportunities provided by the employer." *See Ellerth*, 524 U.S. at 745 (showing that plaintiff "unreasonabl[y] fail[ed] to use any complaint procedure provided by the employer … will normally suffice to satisfy" the second element of the *Ellerth* defense).

Mashni argues that he did not understand the implications of his decision to not file a formal complaint, because the EOCO representatives "never said that such a complaint was required for the EOCO to investigate … [or] take remedial action." PSOF ¶ 40. It is not the Board's responsibility to explain its policies to Mashni, so long as the policies are available to him "without undue risk or expense." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998). Nevertheless, the Board has not established that Mashni behaved unreasonably. "The relevant inquiry is … whether [Mashni] adequately alerted [the Board] to the harassment, thereby satisfying [his] obligation to avoid the harm, not whether [he] followed the

letter of the reporting procedures set out in the employer's harassment policy." *Cerros*, 398 F.3d at 952. Even though Mashni declined to file a formal complaint, he complained of Brake's harassment to EOCO through a letter from his lawyer and at an in-person meeting.[17] PSOF ¶ 37, 39; Ltr. to EOCO.; *see also Passananti v. Cook Cnty.*, 689 F.3d 655, 674 (7th Cir. 2012) ("The jury [] could reasonably find that [plaintiff] acted quite reasonably in complaining through her letter to" the employer's outside counsel "which reached the office that was responsible for investigating the claims of sexual harassment," even though she did not follow the employer's formal policy). Having failed to prove its affirmative defense, Board is not entitled to summary judgment on the hostile work environment claim. This claim can proceed based on both Brake's and Cardona's harassment.

---

[17]What's more, the Board does not point to any policies that actually require complainants to file a formal document before EOCO can investigate alleged harassment. The Board has introduced two policies to the record, R. 42-4. The Combined Americans with Disabilities Act and 504 Policy, which provides "complaint … procedures … [for] allegations of disability discrimination," requires only that "[c]omplaints … be submitted in writing … [to] the EOCO." R. 42-4, Cutler Dec. at Exh. 2, Board Policy 501.1 at V.A.2.a. It is not clear why the March 27 letter from Mashni's counsel to EOCO, which details Brake's harassment, does not qualify as a written complaint. *See* Ltr. to EOCO. The Comprehensive Non-Discrimination Title IX and Sexual Harassment Policy, on the other hand, has a "Formal Complaint" section that states, "[w]hen an individual seeks resolution of a discrimination, sexual harassment or retaliation complaint, the EOCO will request a signed complaint from the Complainant." R. 42-4, Cutler Dec. at Exh. 1, Board Policy 102.8 at V. B.1. But the next paragraph down lists an exception: "The EOCO Administrator may act on allegations of discrimination [including "discrimination on the basis of … disability," *id.* at III.A.1] … or other violations of this policy *even if there is no signed complaint or a Complainant chooses not to pursue the matter.*" *Id.* at V.B.3 (emphasis added). The parties do not state what policy the EOCO representatives were referring to at the April 27 meeting, but neither of the policies in the record require a formal complaint before an investigation into harassment can commence.

## 2. Failure to Accommodate

Next, Mashni argues that the Board failed to accommodate his disability. Under the ADA, employers engage in disability discrimination when they do not "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability … ." 42 U.S.C. § 12112(b)(5)(A). The duty to provide "accommodation" is not synonymous, however, with a duty to provide "a perfect cure for the problem," *Stewart v. Cnty. of Brown*, 86 F.3d 107, 112 (7th Cir. 1996); the statute "does not require an employer to provide literally everything the disabled employee requests." *Schmidt v. Methodist Hosp. of Ind. Inc.*, 89 F.3d 342, 344 (7th Cir. 1996) (citation omitted).

Mashni asked to be accommodated by being transferred away from the Bridge School's elementary school campus. DSOF ¶ 32; PSOF ¶¶ 37, 39; Reas. Accomm. Form.; EOCO Resp. Ltr. He proposed two options: either he could stay in his current job, but work only at the junior high school campus—this would allow him to avoid Brake, whose office was located at in the elementary school, R. 42-7, Mashni Dep. at 33:4-5—or, in the alternative, he could be reassigned to a vacant position as a STEM Technology Specialist.[18] PSOF ¶ 39.

The Board argues that neither of these proposed accommodations was reasonable. The Court agrees, at least as to the first proposal. "Under the ADA, an

---

[18]Mashni also discussed moving to a Technology Coordinator I or II position at another Board school or at Board's Central Office. PSOF ¶ 8; DSOF ¶ 32; EOCO Resp. Ltr. But "the employer's reassignment obligation is … limited to *vacant* positions," and "an employer [is not] obligated to create a new position for the disabled employee." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 291 (7th Cir. 2015) (citations omitted and emphasis in original). The Board did not have any vacant Technology Coordinator I or II positions at the time, DSOF ¶ 38, so the court does not discuss these options.

employer is not required to modify, reduce, or reallocate the essential functions of a job to accommodate an employee." *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 484 (7th Cir. 2002) (citation omitted). "The employer, not a court, determines what functions are essential, and [the court] will not second-guess that decision." *Lloyd*, 552 F.3d at 601. The Board contends that Mashni would not have been able to complete his job duties if he worked only in the junior high school building. Def.'s Reply Br. at 17. The record supports this: Mashni himself testified that he "was in charge [of technology] in both [the elementary and junior high] buildings." R. 50-2, Mashni Dep. at 28:18-22. That meant that he "worked at both locations, meaning there wasn't a day where [he] wasn't in both buildings because there needed to be work [done] in both buildings." R. 42-7, Mashni Dep. at 33:18-23. Mashni's job was to "make sure that every … piece of technology was active and working and working to its functionality." *Id.* at 36:20-22. But if Mashni could only work at the junior high school, someone else would presumably have to manage the elementary school's technological needs. And "[t]o have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013).

Moving on to the second requested accommodation: reassigning Mashni to the vacant STEM Technology Specialist position. "[T]he ADA affirmatively compels consideration of job reassignment to a vacant position, but also allows an employer to consider legitimate nondiscriminatory prerequisites to jobs, such as the

requirement of prior experience … ." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998) (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 675 (7th Cir. 1998)). "It is the plaintiff's burden to show that a vacant position exists for which he was qualified." *Ozlowski v. Henderson*, 237 F.3d 837, 841 (7th Cir. 2001) (citation omitted).

On this issue, the record is so thin that the Court cannot assess the reasonableness of the proposed accommodation. On the one hand, Mashni presents only his own Declaration as evidence that he was qualified for the STEM position. PSOF ¶ 41; Mashni Dec. ¶ 11 ("I believe I was qualified for the position because of my extensive experience as a technology coordinator."). But that bare averment is just a conclusory allegation. *See Ozlowski*, 237 F.3d at 841. Mashni does not actually explain how his experience specifically matched him with the STEM position. Indeed, he does not offer evidence from the viewpoint of decision-makers, either direct (like interrogatory answers or deposition testimony from decision-makers) or circumstantial (like employees filling the STEM position based on similar experience as his). Really, Mashni is just "challeng[ing] the judgment of his superiors," *see Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989) (citation omitted), without sufficient personal knowledge or some other evidentiary basis.

On the other hand, the so-called "legitimate prerequisites" that the Board claims Mashni failed to meet are also unsupported by the record. The Board claims that the STEM position required a teaching certificate and as well three years of

teaching experience. Def.'s Br. at 11-12; DSOF ¶ 38; Def.'s Resp. PSOF ¶ 41. But although "the employer is entitled to define the job in question, in terms of both its essential functions and the qualifications required for it," *Webster v. Methodist Occupational Health Ctrs., Inc.*, 141 F.3d 1236, 1238 (7th Cir. 1998), "[t]here is, on this record, a jury question as to whether … [these were] genuine requirement[s] for the position," *see Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 929 (7th Cir. 2001). The only entry in the record that provides *any* information about the STEM position is a two-page Job Description.[19] R. 42-13, DSOF at Exh. 11, STEM Job Description. The Job Description contains no mention of a teaching certificate. *Id.* Nor does it expressly require three years of teaching experience. *Id.* There *is* a bullet point reading, "Taught at least 3 years and have a strong proficiency in the use of educational technology" under the heading "Qualifications, Skills, Experience." *Id.* But "qualifications, skills, and experience" does not have the hard-edged connotations of "requirements" or "prerequisites." This distinction sharpens after looking at the other bullet points under "Qualifications, Skills, Experience": the list includes amorphous qualities such as "[p]redisposition to be proactive and a self-starter; comfort with ambiguity … ," and "[w]illingness to be a life-long learner," as well as forward-looking expectations such as "[c]ollaborate with teachers to support their use of technology … ." *Id.* The Board might have cleared all this up with actual evidence from a decision-maker who fills STEM positions—rather than just the

_____

[19]There are actually two Job Descriptions, and the parties have not explained the difference between them. They appear substantively identical but for their headings—one is titled "Job Description Internal" and the other "Job Description External," presumably because they were posted internally and externally, respectively.

written Job Description—but there is no such evidence in the record. So viewing this evidence in the light most favorable to Mashni, *Matsushita Elec.*, 475 U.S. at 587, there is a genuine issue as to what the STEM position actually required and whether it constituted a reasonable accommodation for Mashni.[20]

Of course, the Board "is not obligated to provide an employee the accommodation he or she requests or prefers; [it] need only provide some reasonable accommodation." *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998) (citation omitted). But the Board *is* obligated to "engage in an interactive process [with Mashni] to determine a reasonable accommodation." *Id.* (citation omitted). There is a genuine issue, however, as to whether the Board met that obligation. EOCO denied Mashni's request to be reassigned to the STEM position without offering any alternative options. EOCO Resp. Ltr. Instead of adding to the conversation, EOCO left the ball in Mashni's court, informing him that he would need to appeal its decision or secure a new position on his own. *Id; cf. EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 806 (7th Cir. 2005) ("[I]f the employee has requested an appropriate accommodation, the employer may not simply reject it without offering other suggestions or expressing a willingness to continue

---

[20]The Board argues that *any* reassignment is unreasonable because it has no obligation to transfer Mashni just because he wishes to avoid interaction with his supervisor. Def.'s Reply Br. at 15 (citing *Bradford v. City of Chi.*, 121 Fed. App'x 137, 140 (7th Cir. 2005)). But *Bradford* is not precedential and, in any case, it and the precedential decision it follows, *Weiler v. Household Financial Corp.*, 101 F.3d 519 (7th Cir. 1996), are distinguishable. In both of those cases, the plaintiffs experienced stress as a result of conflict with their supervisors. But Mashni does not seek reassignment because he does not get along with Brake, he seeks reassignment in order to avoid discriminatory harassment. The fact that the employer holds the general power to decide an employee's supervisor, *see id.* at 528, does not give the employer the freedom to forcibly subject that employee to a hostile work environment.

discussing possible accommodations."). Although EOCO extended Mashni's Job Protection Date, EOCO Resp. Ltr., the effect was retroactive and did not help move the interactive process forward. Indeed, there is nothing in the record suggesting that the Board made any attempt to identify the "full range of alternative positions available [for which Mashni was qualified,] … including those that would represent a demotion." *Cf. Hendricks-Robinson*, 154 F.3d at 695. Taking all reasonable inferences in Mashni's favor, there is a genuine dispute as to whether a reasonable accommodation was possible, and whether the Board then failed to engage in an interactive process to figure out the appropriate accommodation. The claim for failure to accommodate therefore survives summary judgment.

### 3. Employment Termination

Finally, Mashni attempts to establish an ADA discrimination claim for the closing of the Bridge School position, and he relies on the prima facie method of proof. Pl.'s Resp. Br. at 18-19. This requires a showing that "(1) he was disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citations omitted). The burden then shifts to the employer to produce a "legitimate, non-discriminatory reason for its employment decision." *Id.* "If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.*

Mashni claims that he suffered an adverse employment action "when the [Board] effectively terminated his employment." Pl.'s Resp. Br. at 19. But although he argues that he "was the only person to have his position closed," he does not identify any similarly-situated employees against whom he should be compared. *Id.* at 19. As a result, he has failed to make a prima facie showing.

What's more, Mashi offers nothing suggesting that the Board's legitimate, nondiscriminatory reason for firing him—that is, that Brake believed it would be cheaper to have Mashni's role performed by two hourly employees, DSOF ¶ 30—was pretextual. Mashni attempts to rebut Brake's assertion by denying that the Bridge School actually saved money. Pl.'s Resp. DSOF ¶ 30. But it is not enough to argue that the Board's nondiscriminatory reason for firing Mashni was not sound from a business perspective, or that it was not reasonable.[21] Mashni must show that the reason was *pretextual*—that is, that it could not have been Brake's true reason for acting as he did. *See Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999) ("To survive a motion for summary judgment, [plaintiff] had to counter the company's affidavits with materials of evidentiary quality (such as affidavits or depositions) that created an issue of fact as to whether the reasons offered by the company were sincere—in ADA lingo, not pretextual … ." (cleaned up)). He has not

---

[21]Nor can Mashni support the assertion that he does make. As evidence that replacing him with the hourly employees would not save money, Mashni points to deposition testimony in which Brake attests that he does not recall whether Mashni was still being paid while on disability leave in early 2015. *See* Pl.'s Resp. DSOF ¶ 30; R. 50-6, Brake Dep. at 102:20-22; 107:2-108:10. But of course hiring the hourly employees would not cut down on the budget while Mashni was still on the payroll, and this is not what the Board alleges. The question is whether the hourly employees cost less compared to Mashni *when he was the sole person performing his duties.*

done so, so summary judgment is appropriate on the claim that the termination itself was the product of disability discrimination.

## C. Rehabilitation Act

Mashni next brings a claim under the Rehabilitation Act, which protects "qualified individual[s] with a disability" from being subjected to discrimination "solely by reason of his or her disability … under any program or activity receiving Federal financial assistance … ." *See* 29 U.S.C. § 794(a). The Seventh Circuit "looks to the standards applied under the [ADA] to determine whether a violation of the Rehab[ilitation] Act occurs in the employment context." *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002) (citations omitted). The Rehabilitation Act imposes only one added requirement, that the employer be the beneficiary of federal financial assistance.[22] The Board admits that it receives federal funding, R. 14, Ans. ¶ 11, so that requirement is met.[23]

---

[22]Although this is the only difference under existing Seventh Circuit case law, the ADA Amendments Act of 2008 may have introduced an additional divergence. The Rehabilitation Act offers relief only to those discriminated against "*solely* by reason of [their] disability," 29 U.S.C. § 794(a); until recently, the ADA (as interpreted by the Seventh Circuit) did the same. In *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 959 (7th Cir. 2010), the Seventh Circuit held that, because the ADA lacked language "akin to Title VII's mixed-motive provision," "a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him *but for* his actual or perceived disability; proof of mixed motives will not suffice." (emphasis added) (applying *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *see also Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 705-706 (7th Cir. 2015). But in 2008, Congress amended "the language prohibiting discrimination '*because of* a disability … to prohibit discrimination '*on the basis of* a disability." *Silk*, 795 F.3d at 705 (citing 42 U.S.C. § 12112(a)). The Seventh Circuit has acknowledged that "it is an open question whether the but-for standard [] announced in *Serwatka* survived the amendment to the ADA," but has so far declined to provide an answer. *Silk*, 795 F.3d at 706. So if the Seventh Circuit holds that the replacement of "because of" with "on the basis of" reflects a substantive rather than a cosmetic change, the crack between employment discrimination claims under the ADA

Otherwise, because discrimination claims under the Rehabilitation Act adopt the substantive standards of the ADA, and because Mashni characterizes his Rehabilitation Act claim as identical to his ADA claim with only the addition of the federal-funding component, Pl.'s Resp. Br. at 19; Compl. ¶ 34, his theories of recovery under the Rehabilitation Act share the same fate as their ADA counterparts. So Mashni survives summary judgment as to his hostile work environment[24] and failure to accommodate claims, but cannot establish discrimination for the termination itself.

### D. Intentional Infliction of Emotional Distress

Finally, the Court considers Mashni's common-law claim for intentional infliction of emotional distress. This requires Mashni to show (1) that Brake's conduct was "truly extreme and outrageous"; (2) that he "either *intend[ed]* that his conduct inflict severe emotional distress, or [knew] that there [was] at least a high probability that his conduct [would] cause severe emotional distress"; and (3) "the conduct must in fact cause *severe* emotional distress." *Feltmeier v. Feltmeier*, 798

---

and the Rehabilitation Act may widen. *See Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315 (6th Cir. 2012) (en banc) (recognizing that the ADA and Rehabilitation Act have "two distinct causation standards").

[23]The Board contends that employees can only bring discrimination claims under the Rehabilitation Act if their *specific position* is federally-funded. Def.'s Br. at 14; Def.'s Reply Br. at 19. But there is nothing in the statute that requires this. The Board cites *Novak v. Board of Trustees of Southern Illinois University*, 777 F.3d 966, 974 (7th Cir. 2015) as its only support for this argument. *See* Def.'s Reply Br. at 19. But *Novak* only restates the statutory requirement that the "program in which [the plaintiff] was involved received federal financial assistance." 777 F.3d at 974. Indeed, the statute defines "program" broadly to encompass "*all* the operations of … a local educational agency … *any part of which* is extended Federal financial assistance." *See* 29 U.S.C. § 794(b)(2)(B).

[24]The Seventh Circuit has assumed without deciding that hostile work environment claims are cognizable under the Rehabilitation Act, as it has done with such claims under the ADA. *Mannie*, 394 F.3d at, 982.

N.E.2d 75, 80 (Ill. 2003) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 810 (Ill. 1988)).

The Board argues that this claim is preempted by the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.*, which serves as the exclusive remedy to "workers [who suffered] accidental injuries arising out of and in the course of employment" and "prohibits common law suits by employees against the employer." *See Meerbrey v. Marshall Field and Co.*, 564 N.E.2d 1222, 1225 (Ill. 1990) (citing 820 ILCS 305/5(a)). This exclusivity clause applies only to common-law claims arising out of "accidental" injuries; suits for intentional injuries are excepted from preemption. *Meerbrey*, 564 N.E.2d at 1226.

That does not mean, however, that all intentional infliction of emotional distress claims fall outside the Act. "[I]njuries inflicted intentionally upon an employee by a co-employee are 'accidental' within the meaning of the Act, since such injuries are unexpected and unforeseeable from the injured employee's point of view." *Meerbrey*, 564 N.E.2d at 1226. But if the tort was committed by the "employer or its alter ego," or if it was "commanded or expressly authorized by the employer," it is no longer "accidental" and is recoverable as a common-law claim. *Id.*

Mashni does not argue that the Board expressly authorized Brake's harassment, Pl.'s Resp. Br. at 19-20, so the issue is whether Brake can be considered an "alter ego" of the Board.[25] A tortfeasor can be the alter ego of his employer if (1) he had "authority to control the policies and procedures of the

---

[25]Although Mashni attempts to establish liability based on Cardona's conduct as well as that of Brake, Compl. ¶ 38; Pl.'s Resp. Br. at 19, he does not argue that Cardona was an alter ego of the Board, Pl.'s Resp. Br. at 20.

corporation as an officer, shareholder, or [general] manager"; (2) he is a manager "in a position of authority over other employees and the employer knew of or allowed the injurious conduct or knew there was a substantial likelihood that injurious conduct would occur"; or (3) he is "give[n] complete authority over the operation of [a particular portion of the company's] business but [is] not provide[d] with any instructions against committing intentional torts and [is] allow[ed] … to use [his] own judgment in resolving all of the issues that occur in that business." *Toothman v. Hardee's Food Sys., Inc.*, 710 N.E.2d 880, 886-87 (Ill. App. Ct. 1999) (citations omitted).

Mashni contends that Brake fits this bill, because he "is the highest ranking manager at [Bridge], had control over the school's finances … had final decision-making authority over hirings and firings [at the school, and] was also Mashni's direct supervisor, thereby asserting his dominance over Mashni." Pl.'s Resp. Br. at 20 (citing DSOF ¶¶ 10-11, 13). But these allegations do not suffice. Mashni does not assert that Brake was the equivalent of an officer, shareholder, or general manager of the *Board* (as distinct from just Bridge School), nor does he claim that the Board "knew of or allowed" Brake's conduct when it was occurring. *See Toothman*, 710 N.E.2d at 886; *see also Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1016-17 (7th Cir. 1997) ("[T]he fact that a supervisor was acting within the scope of his or her authority does not equal authorization by the employer for the commission of an intentional tort."). Nor does Mashni argue that Brake enjoyed absolute autonomy from the Board's control, such that he had "complete authority

over the operation of" Bridge Elementary. *Cf. Toothman*, 710 N.E.2d at 887 (holding that restaurant manager was alter ego of defendant restaurant chain where she was personally responsible for all decisions made at the restaurant and did not know, nor was she ever made aware of, the defendant's corporate policies).

At the very most, Mashni's assertions demonstrate that Brake was an alter ego of *the Bridge School*—but the Board, not the Bridge School, is the defendant in this case. *See Gaston v. Bd. of Educ.*, 2017 WL 3234375, at *6 (N.D. Ill. July 31, 2017). And "district courts within this district have repeatedly held that principals and other school administrators are not the alter egos of school boards, including the Chicago School Board." *Id.* (collecting cases). Because Brake is not an alter ego of the Board, any tort injury that Mashni suffered at his hands is "accidental" under the terms of the Illinois Worker's Compensation Act, and can only be recovered pursuant to the Act. *See Meerbrey*, 564 N.E.2d at 1225 (citing 820 ILCS 305/5(a)). As a result, Mashni's intentional infliction of emotional distress claim fails as a matter of law.

## IV. Conclusion

For the reasons stated above, the Board's motion for summary judgment, R. 41, is granted in part and denied in part. The claims for disability discrimination under both the ADA and the Rehabilitation Act may proceed under the hostile work environment and failure to accommodate theories of recovery, but the employment-termination theory is rejected, as is the claim for intentional infliction of emotional distress. Summary judgment is also granted against the retaliation claim. With this

summary judgment motion now decided, the parties must seriously engage in settlement discussions in advance of setting a pretrial conference and trial schedule. The status hearing of September 14, 2017 remains as scheduled.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 1, 2017